# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| MICHAEL MINCKLER, Derivatively on Behalf of Nominal Defendant NUTEX HEALTH INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS T. VO, JON C. BATES, WARREN HOSSEINION, CHERYL GRENAS, MICHAEL L. REED, SCOTT J. SAUNDERS, KELVIN SPEARS, and MITCHELL CREEM, <br><br> Defendants, <br><br> and <br><br> NUTEX HEALTH INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> JURY TRIAL DEMANDED |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Michael Minckler ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Nutex Health Inc. ("Nutex" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Nutex, legal filings, news reports,

securities analysts' reports about the Company, filings in the securities class action captioned *Bhagavan v. Nutex Health Inc. et al.,* Case No. 4:25-cv-03999 (S.D. Tex.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Nutex against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least August 8, 2024, and August 14, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Headquartered in Houston, Texas, Nutex is a physician-led, healthcare services and operations company. The Company reports its operational results in three segments: (i) the hospital division; (ii) the population health management ("PHM") division; and (iii) the real estate division.

3. In its hospital division, the Company maintains twenty-four hospital facilities in eleven states, operating across a network of micro-hospitals, specialty hospitals, and hospital outpatient departments ("HOPDs").

4. The Company's facilities primarily function as out-of-network providers of healthcare.

5. Traditionally, patients who receive treatment from an out-of-network provider are frequently not fully covered under their insurance plans. Accordingly, patients who received out-of-network care often faced higher bills than if they had received the same care from an in-network

---

[1] The Individual Defendants are Thomas T. Vo ("Vo"), Jon C. Bates ("Bates"), Warren Hosseinion ("Hosseinion"), Cheryl Grenas ("Grenas"), Michael L. Reed ("Reed"), Scott J. Saunders ("Saunders"), Kelvin Spears ("Spears"), and Mitchell Creem ("Creem"). "Defendants" means Nutex and the Individual Defendants.

provider. Additionally, through a practice known as "balance billing," out-of-network providers could get around insurance carriers and bill the patient directly for the difference between the amount billed to the patient and the amount paid by their insurance carrier.

6. Then, in December 2020, Congress passed the No Surprises Act ("NSA"), which took effect on January 1, 2022. Under the NSA, healthcare providers were prohibited from billing patients a greater amount than the in-network cost sharing amount for such care. This required the application of in-network cost sharing to out-of-network claims. The NSA also created an independent dispute resolution ("IDR") process to establish payment amounts when open negotiations fail to materialize.

7. Because Nutex operated primarily as an out-of-network provider, a large portion of its revenue was derived from the higher prices it charged out-of-network patients compared to what it would charge in-network patients. Therefore, the enactment of the NSA, and its requirement that healthcare providers charge the median in-network rate of a patient's healthcare plan (rather than the out-of-network cost), caused the Company's financial prospects to suffer.

8. In response, to overcome the change in its business strategy, the Company turned to HaloMD, a third-party IDR vendor, which over the following months, yielded a considerable amount of revenue for the Company's patients and their healthcare providers.

9. Throughout the Relevant Period, the Individual Defendants touted the Company's third-party IDR vendor's[2] ability to generate revenue for the Company, and the Company's promising financial prospects as a result. Additionally, throughout the Relevant Period, the Company highlighted its remediation of its internal controls over financial reporting. However, in

---

[2] The Company did not disclose that its third-party IDR vendor was HaloMD until the end of the Relevant Period.

reality, HaloMD's method for generating revenue through IDR was actually a scheme to defraud insurance companies and the Company had failed to address material weaknesses in its internal controls over financial reporting.

10. The truth began to emerge on July 22, 2025, when Blue Orca Capital ("Blue Orca"), a short seller, issued a report (the "Blue Orca Report"), which revealed that HaloMD was the Company's third-party IDR vendor and alleged, among other things, that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients."[3]

11. On this news, the Company's stock price fell $11.18 per share, or approximately 10.1%, to close at $100.01 per share on July 22, 2025.

12. The truth was fully revealed on August 14, 2025, when the Company issued a press release announcing that it would "delay filing its Form 10-Q for the period ended June 30, 2025" due to "non-cash accounting adjustments related to the treatment of stock-based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings."

13. On this news, the Company's stock price fell $18.22 per share, or approximately 16.4%, to close at $92.91 per share on August 15, 2025.

14. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's third-party IDR

---

[3] Blue Orca Capital, *Blue Orca is Short Nutex Health Inc.* (July 22, 2025), https://www.blueorcacapital.com/blue-orca-is-short-nutex-health-inc/.

vendor was HaloMD; (ii) HaloMD was engaged in fraudulent conduct to achieve lucrative arbitration results for the Company; (iii) the Company's revenue that was being generated through its engagement of HaloMD was unsustainable; (iv) the Company failed to maintain adequate internal controls over its financial and public reporting; (v) the Company overstated its ability to remediate its internal control issues; (vi) as a result of the internal control deficiencies over financial reporting, the Company improperly calculated certain stock based compensation obligations by treating them as equity rather than liabilities; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

15. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Vo, Bates, and Hosseinion in the United States District Court for the Southern District of Texas.

16. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

17. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Nutex's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with

the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

19. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Nutex maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

**PARTIES**

*Plaintiff*

24.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Nutex.

*Nominal Defendant*

25.     Nominal Defendant Nutex is a Delaware corporation with its principal executive offices located at 6030 S. Rice Avenue, Suite C, Houston, Texas 77081. Nutex's common stock trades on the NASDAQ Capital Market under the ticker symbol "NUTX."

*Individual Defendants*

26.     Defendant Vo has served as Chief Executive Officer ("CEO") of the Company and as Chairman of the Board since April 1, 2022. According to the proxy statement filed by the Company on June 2, 2025, on a Schedule 14A with the SEC (the "2025 Proxy"), Defendant Vo received $1,162,214 in compensation from the Company in 2024. Moreover, according to the 2025 Proxy, as of April 23, 2025, Defendant Vo beneficially owned 32.88% of the Company's Class A common stock.

27.     Defendant Bates has served as Chief Financial Officer ("CFO") of the Company since June 2022. According to the 2025 Proxy, Defendant Bates received $682,578 in compensation from the Company in 2024.

28.     Defendant Hosseinion has served as President and a director of the Company since April 1, 2022. Hosseinion previously served as CEO and Chairman of the board of directors of Clingience Holdings, Inc. ("Clingience"), the predecessor of Nutex.[4] According to the 2025 Proxy, Defendant Hosseinion received $1,243,432 in compensation from the Company in 2024.

29.     Defendant Grenas has served as a director of the Company since April 1, 2022.

---

[4] On April 1, 2022, Nutex Health Holdco, LLC merged with and into Clingience, which was then renamed "Nutex Health Inc." (the Company).

Grenas also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating and Governance Committee. According to the 2025 Proxy, Defendant Grenas received $162,500 in compensation from the Company in 2024.

30.     Defendant Reed has served as a director of the Company since April 1, 2022. Reed also serves as Chair of the Company's Nominating and Governance Committee and as a member of the Company's Audit Committee and Compensation Committee. According to the 2025 Proxy, Defendant Reed received $165,000 in compensation from the Company in 2024.

31.     Defendant Saunders has served as a director of the Company since April 1, 2022. Saunders also serves as a member of the Company's Audit Committee and Nominating and Governance Committee. According to the 2025 Proxy, Defendant Saunders received $107,955 in compensation from the Company in 2024.

32.     Defendant Spears has served as a director of the Company since April 1, 2024. Spears also serves as a Physician Partner, Chief Medical Director, and ED Director at Alexandria Emergency Hospital in Alexandria, Louisiana, which is an affiliate hospital of the Company.

33.     Defendant Creem served as a director of the Company from April 1, 2022, until July 14, 2025. During the Relevant Period, Creem also served as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee and Nominating and Governance Committee. According to the 2025 Proxy, Defendant Creem received $169,160 in compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers and/or directors of Nutex, and because of their ability to control the business and corporate affairs of Nutex, the Individual Defendants owed Nutex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and

were and are required to use their utmost ability to control and manage Nutex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nutex and its shareholders.

35.    Each director and officer of the Company owes to Nutex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nutex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    To discharge their duties, the officers and directors of Nutex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Nutex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40. To discharge their duties, the officers and directors of Nutex were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nutex were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas and the United States, and pursuant to Nutex's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Nutex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Nutex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nutex's operations would comply with all applicable laws and Nutex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41. Each of the Individual Defendants further owed to Nutex and the shareholders the duty of loyalty requiring that each favor Nutex's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42. At all times relevant hereto, the Individual Defendants were the agents of each other and of Nutex and were at all times acting within the course and scope of such agency.

43. Because of their advisory, executive, managerial, and directorial positions with Nutex, each of the Individual Defendants had access to adverse, non-public information about the Company.

44. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nutex.

## NUTEX'S CODE OF CONDUCT

45. The Company's Code of Conduct states that it applies to "all directors, officers, and employees of the Company, and that it is "intended to focus all such parties on areas of ethical risk, provide guidance to directors and officers to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability."

46. Under a section titled "Conflict of Interest," Nutex's Code of Conduct states, in relevant part:

> Directors, officers, and employees must avoid any conflicts of interest between the director, officer, or employee, as the case may be, and the Company. Any situation that involves, or may involve, a conflict of interest with the Company, should be disclosed promptly to the Board, which may consult with inside or outside legal counsel as appropriate.

> A "conflict of interest" can occur when a director's, officer's, or employee's personal interest is averse to – or may appear to be adverse to – the interests of the Company as a whole. Conflicts of interest also arise when a director, an officer, an employee, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. For purposes of this Code, "immediate family" includes a person's spouse, parents, children, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law and anyone (other than employees) who share such person's home.

> This Code does not attempt to describe all possible conflicts of interest which could develop. Some of the more common conflicts from which directors must refrain, however, are set out below.

*Improper conduct and activities.* Directors, officers, and employees may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

47.     Under the section titled "Compliance with Laws, Rules and Regulations; Fair

Dealing," the Code of Conduct states, in relevant part:

> Directors, officers, and employees shall comply, and shall oversee policies designed to promote compliance, with all laws, rules and regulations applicable to the Company, including, but not limited to, federal and state securities laws, rules, and regulations, and the rules and regulations of the American Stock Exchange.
>
> Directors, officers, and employees shall endeavor to insure that the Company's public disclosure communications, including filings with the Securities and Exchange Commission, are full, fair, accurate, timely, and understandable, and shall, to the extent part of their job responsibilities, maintain familiarity with the disclosure requirements applicable to the Company. Said parties are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit material facts about the Company to others, whether within or outside the Company.
>
> Directors and officers shall oversee policies designed to promote ethical dealing by employees and officers with the Company's customers, suppliers, competitors and employees.

## NUTEX'S AUDIT COMMITTEE CHARTER

48.     Nutex's Audit Committee Charter states that the purpose of the Audit Committee

is to assist the Board in:

- Overseeing the integrity of the company's financial processes and financial statement audits

- Overseeing the company's compliance with legal and regulatory requirements

- Overseeing the registered public accounting firm's (independent auditor's) qualifications and       independence

- Overseeing the performance of the company's independent auditor and internal audit function

- Overseeing the company's systems of disclosure controls and procedures

- Overseeing the company's internal controls over financial reporting

- Overseeing the company's compliance with ethical standards adopted by the company.

49.     Additionally, under the section titled "Purpose and authority," the Audit Committee

Charter states, in relevant part, that:

> The audit committee should encourage continuous improvement and should foster adherence to the Company policies, procedures, and practices at all levels. The audit committee has the authority to conduct investigations into any matters within its scope of responsibility and obtain advice and assistance from outside legal, accounting, or other advisers when necessary to perform its duties and responsibilities.

50.     In a section titled "Responsibilities and duties," the Audit Committee Charter states

that the Audit Committee has the following duties and responsibilities, among others:

> **Documents/reports/accounting information review**
>
> Review this charter at least annually and recommend any necessary amendments to the board of directors.
>
> Meet with management and the independent auditor to review and discuss the Company's annual financial statements and quarterly financial statements prior to the company's Form 10-K and 10-Q filings or release of earnings, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations".
>
> Review internal control reports (or summaries thereof), other relevant reports or financial information submitted by the company to any governmental body, or the public, and relevant reports rendered by the independent auditor (or summaries thereof). Review internal control reports (or summaries thereof), other relevant reports or financial information submitted by the company to any governmental body, or the public, and relevant reports rendered by the independent auditor (or summaries thereof).
>
> Discuss the listed company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the

type of presentations to be made).

Review the regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as Management's response. . . .

**Financial reporting processes, accounting policies, and internal control structure**

In consultation with the independent auditor and the internal audit function, review the integrity of the Company's internal and external financial reporting processes.

Understand the scope of the audit plan, including the independent auditors' review of internal control over financial reporting. Receive and review any disclosure from the company's CEO and CFO made in connection with the certification of the company's quarterly and annual reports filed with the SEC of: a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial data; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; major issues as to the adequacy of the company's internal controls; and any special audit steps adopted in light of material control deficiencies.

Review analyses prepared by management and the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

Review the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the financial statements of the company.

Review and approve all related-party transactions, defined as those transactions required to be disclosed under Items 404(a) and (b) of Regulation S-K, NYSE Rule 314.00, and NASDAQ Corporate Governance Rule 5630. Discuss with the independent auditor its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for confidential, anonymous submissions by company employees regarding questionable accounting or auditing matters.

**Ethical compliance, legal compliance, and risk management**

Oversee, review, and periodically update the Company's code of business conduct and ethics and the Company's system to monitor compliance with and enforcement of this code.

Review, with the Company's counsel, legal compliance and regulatory matters that could have a significant impact on the company's financial statements.

Discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the Company's major financial risk exposures and the steps management has undertaken to control them.

Consider the risk of Management's ability to override the Company's internal controls. Reporting Report regularly to the board regarding the execution of the Audit Committee's duties, responsibilities, and activities, any issues encountered, and related recommendations.

**Reporting**

Report regularly to the board regarding the execution of the Audit Committee's duties, responsibilities, and activities, any issues encountered, and related recommendations.

Recommend to the board of directors that the audited financial statements be included in the Company's annual report on Form 10-K.

Provide a report of the audit committee, which contains certain required disclosures, in the Company's annual proxy.

## <u>SUBSTANTIVE ALLEGATIONS</u>

*Background*

51. Headquartered in Houston, Texas, Nutex is a physician-led, healthcare services and operations company. The Company reports its operational results in three segments: (i) the hospital division; (ii) the PHM division; and (iii) the real estate division.

52. In its hospital division, the Company maintains twenty-four hospital facilities in eleven states, operating across a network of micro-hospitals, specialty hospitals, and HOPDs. The Company has 800 full-time employees, contracts with 255 doctors at its facilities, and partners

with over 2,100 physician and specialists within its network. The hospital division generally recognizes revenue for contracts with patients who possess out-of-network benefits with third-party payors (such as commercial insurance), meaning that the Company primarily operates as an out-of-network provider.

53.    As part of its PHM division, the Company operates provider networks, such as independent physician associations ("IPAs"). The Company's largest IPA is located in Los Angeles, California, and oversees approximately 33,000 patients.

54.    The Company's real estate division owns the land and structures leased to the Company's hospital facilities. As such, the Company does not have direct ownership interest in the Real Estate Entities but in certain cases such entities are owned and controlled by related parties, such as the Company's CEO.

55.    Prior to the NSA taking effect on January 1, 2022, patients' healthcare plans generally did not cover the full costs of treatment from an out-of-network provider. Therefore, patients who received out-of-network care often faced higher costs than if they had received the same care from an in-network provider. Additionally, out-of-network providers frequently used "balance billing" to get around insurance carriers and bill the patient directly for the difference between the amount billed to the patient and the amount paid by their insurance carrier.

56.    However, once the NSA took effect, healthcare providers were: (i) required to cover out-of-network claims and apply in-network cost sharing; and (ii) prohibited from billing patients a greater amount than the in-network cost sharing charge for any "surprise bills" that resulted from balance billing.

57.    The NSA also created an IDR process to settle out-of-network payments between healthcare plans and providers in the event of failed negotiations. Through the IDR process,

healthcare plans and providers submit their own payment figure and supplemental evidence to an arbitrator. The arbitrator then takes the "qualifying payment amount" or the median contract rate for the same geographic area for similar areas, among other metrics, and selects one of the two proposed amounts.

58.     Because Nutex operated primarily as an out-of-network provider, the enactment of the NSA caused the Company's financial prospects to suffer. Specifically, as the cost-sharing method adopted through the NSA typically reflected the median in-network healthcare plan rates, the Company was unable to utilize out-of-network billing to generate additional revenue from the services being provided to its patients.

59.     The Company reflected this change in its annual report for 2022 filed with the SEC on a Form 10-K on March 3, 2023 (the "2022 10-K"), which stated that "[s]ince the NSA became effective . . . our average payment by insurers of patient claims for emergency services has declined by approximately 30% including as much as a 37% reduction for physician services." The Company further stated in the 2022 10-K that "[i]n our experience, insurers often initially pay amounts lower than the QPA without regard for other information relevant to the claim. This requires us to make appeals using the IDR process."

60.     Thereafter, in order to overcome the change in its business strategy, the Company determined to achieve better results in the IDR process and engaged HaloMD, a third-party IDR vendor, in July 2024. In the following months, the Company began to report increasing success of the IDR process and considerable amounts of revenue for the Company's patients and their healthcare providers. Notably, the Company never disclosed the identity of its new third-party IDR vendor to investors.

61.     Throughout the Relevant Period, the Individual Defendants touted HaloMD's

ability to generate revenue for the Company, and the Company's promising financial prospects as a result. Additionally, throughout the Relevant Period, the Company highlighted its remediation of its internal controls over financial reporting. However, in reality, HaloMD's method for generating revenue through IDR was actually a scheme to defraud insurance companies and the Company had failed to address material weaknesses in its internal controls over financial reporting.

***Individual Defendants' Materially False and Misleading Statements***

62.     On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"), which was filed as an attachment to a Form 8-K filed with the SEC. The 2Q24 Earnings Release reported, in relevant part, that "[t]otal revenue of $76.1 million as compared to total revenue of $58.9 million for the three months ended June 30, 2023, an increase of 29%."

63.     Additionally, the 2Q24 Earnings Release stated:

"***We are pleased to report 29% revenue growth, Adjusted EBITDA, attributable to Nutex Health Inc. of $12.0 million and a 150% increase in hospital division operating income to $22.8 million in the second quarter ended June 30, 2024, showing our continued focus on top line growth, increasing cash flow as well as improving profitability***," stated Jon Bates, Chief Financial Officer of Nutex Health.

"***Nutex Health is executing extremely well, and we plan to continue to advance our strategic initiatives to drive sustainable growth***. We delivered solid revenue growth while accelerating cash flow and strengthening our balance sheet in the first half of 2024. ***We are confident that we are taking the right steps to lay the foundation for long-term success and to increasing shareholder value***," stated Warren Hosseinion, M.D., President of Nutex Health.

"We had a solid Second Quarter with strong year over year growth. Volume continues to increase overall among our hospitals. ***Our average payment by insurers of patient claims increased, a trend we are optimistic will persist as we continue to work the NSA claims through the Independent Dispute Resolution process***," stated Tom Vo, M.D., MBA, Chairman and Chief Executive Officer of Nutex Health.

(Emphasis added).

64.     On the same day, the Company filed a quarterly report for the period ended June

30, 2024, on a Form 10-Q with the SEC (the "2Q24 10-Q"). The Company highlighted its new

"third-party IDR" in the 2Q24 10-Q, stating, in relevant part:

> On July 1, 2024, we engaged with a third-party IDR vendor ***to further support all of our out of network claims and determine which claims would be beneficial to arbitrate***. The IDR arbitration process can take up to four to six months to receive payments. Based on the available data we have analyzed from the third and fourth quarters of 2023, providers have submitted higher offers and have prevailed 80% of the time through IDR.

(Emphasis added).

65.     Additionally, with respect to the Company's internal controls and procedures, the

2Q24 10-Q stated, in relevant part, that:

- The Company had ineffective design, implementation, and operation controls over logical access, program change management, and vendor management controls. . . .

- Business process controls across all financial reporting processes were not effectively designed and implemented to properly address the risk of material misstatement, including controls without proper segregation of duties between preparer and reviewer and key management review controls.

- Ineffective design and implementation of controls over the completeness and accuracy of information included in key spreadsheets supporting the financial statements.

66.     With respect to remediation of the Company's internal control and procedure

deficiencies, the 2Q24 10-Q stated, in relevant part:

> *Remediation Plans*. These material weaknesses did not result in a material misstatement of the Company's consolidated financial statements for the periods presented. In 2024, the Company started the process of designing and implementing effective internal control measures to remediate the reported material weaknesses. The Company's efforts included implementing a new enterprise-wide system to reduce reliance on manual processes and spreadsheets supporting the financial statements. Additionally, the Company engaged an accounting firm in 2024 to assist in the proper design, implementation and testing of internal controls over financial reporting. We made additions to our accounting and financial reporting teams throughout 2024.

67.     The 2Q24 10-Q was signed by Defendants Vo and Bates and was accompanied by certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Vo and Bates, wherein they attested to the accuracy of the 2Q24 10-Q.

68.     On August 9, 2024, the Company hosted an earnings call for investor and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"), during which Defendant Vo touted the potential value and revenue from arbitration arising out of the NSA, stating, in relevant part:

> We have also already begun to engage in the arbitration process of the independent dispute resolution, whereas previously we had stopped at the open negotiation process. ***We believe that there is a lot of potential incremental value and revenue to be gained from arbitration as we believe that the insurers typically pay us very low the first time***. Arbitration is a tool provided by the No Surprises Act to ensure providers receive fair treatment. In recent articles and public data, we are seeing that providers are prevailing 70% to 80% of the time in arbitration.

(Emphasis added).

69.     On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"), which was also filed with the SEC as an attachment to a Form 8-K. The 3Q24 Earnings Release touted the Company's financial results, reporting, in relevant part:

**Financial Highlights for the Three Months Ended September 30, 2024:**

- Total revenue of $78.8 million as compared to total revenue of $62.7 million for the three months ended September 30, 2023, an increase of 26%.

- Operating income (including the negative impact of a $2.0 million non-cash stock-based compensation expense) for the three months ended September 30, 2024 was $9.7 million, compared to an operating loss of approximately $0.8 million for the three months ended September 30, 2023, representing a $10.5 million improvement quarter over quarter. . . .

- Adjusted EBITDA attributable to Nutex Health of $13.5 million, as compared to Adjusted EBITDA attributable to Nutex Health of $1.3 million

21

for the three months ended September 30, 2023, an increase of 938%.

70. Defendant Bates was quoted in the 3Q24 Earnings Release as stating:

We are pleased to report 25% revenue growth, Adjusted EBITDA attributable to Nutex Health of $13.5 million and a 209% increase in gross profit to $21.9 million in the third quarter ended September 30, 2024, ***showing our continued focus on top line growth, increasing cash flow as well as improving profitability***[.]

(Emphasis added).

71. Additionally, Defendant Hosseinion was quoted in the 3Q24 Earnings Release as stating:

Nutex Health had another outstanding quarter. The strategic and operational decisions we have made over the last nine months are driving this strong performance, as demonstrated by another quarter of year-over-year growth in revenue, EBITDA and Adjusted EBITDA as well as incremental growth in cash flow. ***We are confident that our momentum will continue and plan on growing our hospital and population health divisions responsibly as we drive value for our shareholders***[.]

72. Moreover, in the 3Q24 Earnings Release, Defendant Vo was quoted as stating:

The four de-novo hospitals that we opened in 2023 are ramping up nicely, resulting in strong year-over-year growth in both revenue and patient volume. Volumes and revenue continue to increase among our mature hospitals, both on the outpatient side as well as the inpatient side, which still have excess capacity. ***Our average payment by insurers of patient claims also increased, a trend we are optimistic will persist as we continue to work the NSA (No Surprises Act) claims through the Independent Dispute Resolution process***[.]

(Emphasis added).

73. On the same day, the Company filed a quarterly report for the period ended September 30, 2024, on a Form 10-Q with the SEC (the "3Q24 10-Q"). The 3Q24 10-Q included the same statements on the third-party IDR as ¶ 64, *supra*.

74. The 3Q24 10-Q also contained substantially the same statements regarding the Company's material weaknesses surrounding its internal controls and procedures, and the

Company's remediation efforts in connection therewith as included in ¶¶ 65-66, *supra*.

75.     The 3Q24 10-Q was signed by Defendants Vo and Bates and was accompanied by SOX Certifications made by Defendants Vo and Bates, wherein they attested to the accuracy of the 3Q24 10-Q.

76.     On November 8, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Vo stated, in relevant part:

> We are pleased to report another excellent quarter for Nutex Health. In the third quarter of 2024, [] we achieved substantial revenue growth as well as volume growth and continue to show our commitment to enhancing profitability and operational efficiency. I would like to start with some highlights from this quarter. For the three months ended September 30, 2024, we reported total revenue of $78.8 million which is a significant increase compared to $62.7 million for the same period last year. This equates to a growth of 26%. . . .
>
> [O]ur internal coding, billing and collections department, operationally, are getting more experience in working the No Surprises Act or NSA claims. Adapting to specific nuances and solving complex problems in dealing with insurers post NSA. As a result, we are seeing better reimbursement per patient. . . .
>
> We continually strive to obtain fair in-network contract with insurers. If this is not possible, we make serious attempts to get a fair qualified payment amount or QPA from the insurers. If we do not get a fair QPA as described in the NSA bylaws, the first time, we proceed with the independent dispute resolution or IDR which includes both the open negotiation as well as arbitration process options.

77.     On February 5, 2025, the Company issued a press release titled "Nutex Health Issues No Surprise Act (NSA) Arbitration Update" (the "NSA Press Release"), which was also filed with the SEC as an attachment to a Form 8-K. The NSA Press Release stated, in relevant part:

> Nutex Health Inc. ("Nutex Health" or the "Company") (NASDAQ: NUTX), a physician-led, integrated healthcare delivery system comprised of 24 state-of-the-art micro-hospitals in 11 states and primary care-centric, risk-bearing physician networks, today provided an update regarding its strategic participation in arbitration known as the Independent Dispute Resolution ("IDR") process under the No Surprises Act ("NSA").

As previously disclosed in our September 30, 2024 Form 10-Q, on July 1, 2024 the Company contracted with a third-party vendor to assist in the recovery of certain out of network claims under the arbitration process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

***These increasingly favorable outcomes are expected to allow the Company to recover substantial amounts previously underpaid by insurers. Due to significant administrative time built into the federal arbitration process and delays in collections, the Company is now beginning to realize the full cash impact of its enhanced arbitration process that was commenced in July 2024***. . . .

"***Our proactive approach to arbitration under the No Surprises Act has yielded positive results thus far, reinforcing our commitment to fair reimbursement. By effectively leveraging our industry leading expertise and knowledge, we have been able to secure rightful payments for our facilities and providers while continuing to deliver high-quality, accessible care to our communities***," stated Tom Vo, M.D., Chairman and Chief Executive Officer of Nutex Health. "The momentum we have built in 2024 places Nutex Health in a strong position for continued success in the coming year.".

(Emphasis added).

78. On March 31, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year 2024 (the "4Q24 Earnings Release"), which was also filed with the SEC as an attachment to a Form 8-K. The 4Q24 Earnings Release stated, in relevant part, that:

The arbitration process resulted in approximately $169.7 million more in revenue in 2024 than in 2023, which amounted to approximately 73.1% of the $232.3 million revenue increase. Of the $169.7 million in arbitration revenue, $68.9 million, $70.5 million and $30.3 million related to dates of services for the fourth quarter 2024, third quarter 2024 and pre-third quarter 2024, respectively.

79. Defendant Vo was also quoted in the 4Q24 Earnings Release as stating:

Nutex Health delivered healthy year-end and fourth quarter financial and operational results last year. ***The arbitration initiative that we began in July 2024 is generating higher reimbursement amounts per visit this year and is more in line with a fair market rate***. We would like to thank our dedicated teams of physicians, nurses and all our other team members for continuing to deliver for our patients. We enter 2025 with great momentum and look forward to continuing our

strong financial and operational performance[.]

(Emphasis added).

80.     On the same day, the Company filed its annual report for 2024 on a Form 10-K with the SEC (the "2024 10-K"). Under the section titled "Governmental Regulation," the 2024 10-K stated, in relevant part:

*Nutex and the NSA.* While we are working within the established processes for IDR, we have had varying successes at achieving collections at or higher than the established QPA. We have undertaken several strategic actions designed to improve our collections results. These include:

- ***engaging a third-party IDR vendor for claims under IDR***,
- maximizing our claims coding efficiency,
- increasing efforts to collect co-pays and co-insurance,
- adding additional administrative staff to handle the increased administrative IDR burden,
- ***having a dedicated IDR team to accelerate resubmission of claims under the IDR process***,
- making appeals for additional payment of claims for periods before and after the NSA final rule was adopted through the IDR process,
- ***making efforts to sign favorable contracts with new insurers***,
- ***working to sign more favorable contracted rates with existing contracted providers***,
- ***working with both local and national legislatures to enforce the NSA rules and guidelines for Insurers***, and
- focusing on the value-based IPA side of our business, which is less affected by the NSA.

*Arbitration Process.* On July 1, 2024, we engaged with a third-party IDR vendor to assist in the recovery of certain out of network claims under the IDR process. The IDR process, including subsequent appeals and insurance payor delays, require extensive administrative time and delays in collections, which can take up to three to five months to receive payments from when we start the open negotiation process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

(Emphasis added).

81.     The 2024 10-K also contained substantially similar statements concerning the

material weaknesses in the Company's internal controls over financial reporting and the Company's remediation efforts as identified in ¶¶ 65-66, *supra*

82.     The 2024 10-K was signed by Defendants Vo, Bates, Hosseinion, Creem, Grenas, Reed, Saunders, and Spears. The 2024 10-K was also accompanied by SOX Certifications made by Defendants Vo and Bates, wherein they attested to the accuracy of the 2024 10-K.

83.     On April 1, 2025, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Vo stated, in relevant part:

> Now let's turn to a critical piece of our 2024 story. The No Surprises Act or the NSA. And the arbitration process, otherwise known as Independent Dispute Resolution Process or IDR. The NSA effective January 1, 2022, aimed to shield patients from surprise medical bills. A noble intent we fully support and fully adhere to. However, the flawed implementation of the NSA has hit providers like us very, very hard, and specifically on the revenue per patient reimbursement side. In 2022, our average insurer payments for emergency services dropped roughly 30%. The root issue is that insurers often pay below the qualifying payment amount or QPA, which was described and mandated in the NSA. . . .
>
> Since we have implemented the arbitration process, the results have been positive. As I mentioned earlier, while our volume -- our patient volume increased by about 30% in 2024 compared to 2023, our revenue increased by about 94%. And some of this, as a result -- some of this was a result of higher patient volume and acuity to our facility, but a lot of it also was directly from our arbitration initiative.
>
> Since 2024, we have submitted roughly between 60% to 70% of our billable visits to the IDR or arbitration portal. Of these claims submitted, we have achieved a roughly 80% win rate. Of these over 80% plus arbitration wins once again, which are binding, we expect the insurers to pay 60% to 70% in the first 60 days and the rest later.
>
> In terms of revenue per visit increase from the IDR process, we typically find a 150% to 250% increase in reimbursement on the facility collection side compared to the initial payment. And once again, this is all consistent with the public data and consistent with the data that are published by other providers that are also doing arbitration like we are. Once again, the goal of arbitration really is just to get to the QPA payment level as outlined in the No Surprises Act. And so far, arbitration seems to be working as it was designed to do.

84.     On May 13, 2025, the Company filed a quarterly report for the period ended March 31, 2025, on a Form 10-Q with the SEC (the "1Q25 10-Q"). The 1Q25 10-Q contained substantially similar statements regarding the Company's third-party IDR vendor as identified in ¶ 64, *supra*.

85.     The 1Q25 also contained substantially similar statements regarding the Company's material weaknesses in internal controls over financial reporting and remediation efforts as identified in ¶¶ 65-66, *supra*.

86.     The 1Q25 10-Q was signed by Defendants Vo and Bates and was accompanied by SOX Certifications made by Defendants Vo and Bates, wherein they attested to the accuracy of the 1Q25 10-Q.

87.     On May 14, 2025, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Vo stated, in relevant part:

> Let me take a few moments to discuss the arbitration process that we first implemented in July of 2024. Overall, it is a small but very important part of our operation. In the first quarter of 2025, we submitted between 60% to 70% of billable visits through the arbitration portal. We achieved an 80% plus win rate of these emissions, resulting in facility collections [. . .] increasing by between 200% to 300% compared to the initial insurance payments. This means that an independent arbitrator has legally determined that the insurance companies are paying us initial payments that are much lower than fair and reasonable rates over 50% of the time. So far, even with these winning percentages, we have not seen any significant behavioral changes. We are constantly monitoring legislative and legal developments at both [Center for Medicare & Medicaid Services ("CMS")] and in Congress, to make sure we are on top of any potential changes.

88.     On June 2, 2025, the Company filed the 2025 Proxy with the SEC. The 2025 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

**The Board's Role in Risk Oversight**

Our Board has responsibility for the oversight of the Company's risk management

processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, the potential impact of these risks on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from Board committees and members of senior management to enable our Board to understand the Company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including the Company's corporate strategy, business objectives, compliance, financial condition, legal, regulatory, commercial and reputational risk. The committees of the Board execute their risk oversight responsibility for risk management as follows:

(1)     The Audit Committee reviews information regarding liquidity and operations and oversees our management of financial risks as well as risks associated with cybersecurity. Periodically, the Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and financial-related regulatory compliance. Oversight by the Audit Committee includes direct communication with our internal and external auditors, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures.

(2)     The Compensation Committee is responsible for the design and oversight of our executive compensation philosophy, policies, plans and practices, including ensuring that our overall executive compensation program appropriately links pay to performance and aligns the interests of our executives with our stockholders and that the elements of our compensation programs mitigate excessive risk-taking.

(3)     The Nominating and Governance Committee manages risks associated with the independence of members of our Board, corporate disclosure practices, potential conflicts of interest, and corporate responsibility and sustainability efforts, including the impact of ESG issues. The Nominating and Governance Committee also provides oversight of our non-financial compliance program by monitoring our compliance policies, standards, procedures, systems and initiatives as well as oversight of our quality, regulatory and commercial compliance programs.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. Matters of significant risk are considered by our Board as a whole.

89.     The 2025 Proxy also assured investors that the Board complied with the Code of

Conduct, stating:

Our Board has adopted a Code of Business Ethics Policy to assist the Board in the exercise of its responsibilities and to serve as a framework for the effective governance of the Company. You can access our current committee charters, our

Code of Business Ethics Policy in the "Governance" section of the "Investors" page of our web site located at https://www.nutexhealth.com/governance-documents/.

90.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's third-party IDR vendor was HaloMD; (ii) HaloMD was engaged in fraudulent conduct to achieve lucrative arbitration results for the Company; (iii) the Company's revenue that was being generated through its engagement of HaloMD was unsustainable; (iv) the Company failed to maintain adequate internal controls over its financial and public reporting; (v) the Company overstated its ability to remediate its internal control issues; (vi) as a result of the internal control deficiencies over financial reporting, the Company improperly calculated certain stock based compensation obligations by treating them as equity rather than liabilities; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth is Revealed**

91.     The truth began to emerge on July 22, 2025, when Blue Orca issued the Blue Orca Report regarding the Company's relationship with HaloMD. Notably, the Blue Orca Report revealed that the Company's "unidentified 'third-party IDR vendor'" was HaloMD and that "[t]hree new lawsuits in federal court, all filed in recent weeks, allege that HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients" and that "this alleged conduct could explain Nutex's apparent recent tripling of revenue per hospital visit." Moreover, the Blue Orca Report stated that "[o]nce Nutex can no longer use the NSA arbitration system to receive unsustainably high reimbursement rates,

our suspicion is that Nutex will return to penny stock status."

92.    First, the Blue Orca Report noted that the implementation of the NSA drastically impacted the Company's ability to generate revenue, stating that "[t]he crackdown on surprise billing resulted in Nutex reporting large operating and net losses in 2022 and 2023, leading its market cap to plunge to less than $30 million." Blue Orca went on to state that HaloMD "[m]iraculously [t]ransformed" the Company's business and that following the hiring of an "undisclosed 'third party IDR vendor,'" "Nutex's hospital division reported nearly 250% sequential revenue growth in Q4 2024. In a single quarter, Nutex's corporate EBIT margin grew from 12% to 44%. This dramatic change led to Nutex stock appreciating more than 20x from its lows."

93.    The Blue Orca Report went on to state that "[t]o [Blue Orca's] knowledge, Nutex does not disclose the identity of this vendor in any of the filings and conference calls," but "[f]or each of Nutex's hospitals that filed arbitrations in Q4 2024, in all but one the email domain was identified as 'halomd.com.'":

| DLI Number | Payment Determination Outcome | Provider/Facility Name | Provider Email Domain | Health Plan/Issuer Name | Provider/Facility Offer as % of QPA | Health Plan/Issuer Offer as % of QPA | Prevailing Party Offer as % of QPA |
|---|---|---|---|---|---|---|---|
| DLI - 4778941 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | 100% | 1,311% |
| DLI - 4741597 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 874% | N/A | 874% |
| DLI - 4724114 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,404% | 100% | 1,404% |
| DLI - 4724115 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 118% | 2,029% |
| DLI - 4731740 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,252% | N/A | 1,252% |
| DLI - 4730135 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 813% | 154% | 813% |
| DLI - 4730136 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,084% | 124% | 1,084% |
| DLI - 4783267 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | N/A | 1,311% |
| DLI - 4731913 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,598% | N/A | 1,598% |
| DLI - 4741601 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | N/A | 1,354% |
| DLI - 4731920 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 114% | 1,354% |
| DLI - 4721689 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 164% | 2,029% |
| DLI - 4722849 | In Favor of Provider/ | WEST PLANO EP | halomd.com | UMR | 1,244% | 165% | 1,244% |
| DLI - 4876708 | In Favor of Provider/ | WEST PLANO EP | halomd.com | Cigna | 2,453% | 346% | 2,453% |
| DLI - 4722762 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 155% | 1,354% |

Source: CMS IDR Reports, Q4 2024

This appears to be the domain for HaloMD, which appears to be related to Texas-based MPOWERHealth.[4] Led by a former Las Vegas stripper and *Apprentice* contestant, HaloMD is rapidly gaining share in the IDR arbitration market and claims to have achieved spectacular results for its clients.

94.    The Blue Orca Report then discussed the three recent lawsuits that were filed

against HaloMD by Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a Anthem Blue Cross for violating various federal and state laws by submitting false attestations of eligibility and initiating massive volumes of IDR disputes. Specifically, the Blue Orca Report stated that the lawsuits allege that "HaloMD and its healthcare services clients of stealing tens [of] millions of dollars from insurers by flooding the arbitration system with thousands of claims that they knew at the time of submission to be ineligible." The Blue Orca Report also referenced a demonstrative from one of the lawsuits to explain HaloMD's process:



Source: Case: 1:25-cv-00388-MWM Document 1, Filed in June 2025

95.     The Blue Orca Report continued by stating that the plaintiffs in the lawsuits alleged that HaloMD was able to "garner tens of millions of dollars in improper payments by **falsely attesting to the eligibility of claims and by improperly inflating payment offers that far exceeded the amounts to which providers should have been entitled**," and, in one of the lawsuits, "plaintiffs allege that HaloMD circumvented the attestation guard rails of the arbitration submission system by simply **fabricating evidence**." The Blue Orca Report also stated that

**"[t]hese stunning allegations estimate that approximately 50%-70% of the disputes on which defendants submitted arbitrations and received payment determinations were ineligible**, and that even on eligible claims, HaloMD inflated the value of services to allegedly steal ill gotten money from insurers."

96.     In discussing the effect of the lawsuits on Nutex, the Blue Orca Report stated, in relevant part, that "[a]lthough it is important to note that Nutex was not named in any of these suits, and to date no insurer has alleged that Nutex has done anything wrong, ***we believe these lawsuits are the first of what may be a tidal wave of litigation against HaloMD and its clients, and it may only be a matter of time before Nutex itself is targeted***." (Emphasis added). The Blue Orca Report also stated that "CMS data shows that Nutex was a major HaloMD client (with around 14,000 arbitration line items in Q4 2024, ~66% of which were against Blue Cross Blue Shield affiliates) and that HaloMD achieved remarkable results in arbitration proceedings on behalf of Nutex." Additionally, the Blue Orca Report stated that, "[n]ot only will this be costly . . . but insurers are demanding punitive damages and a clawback of improperly paid awards. **In such a case, Nutex may be at risk to have to repay revenue already recognized and collected**." (Emphasis in original).

97.     Blue Orca then stated that, regardless of whether Nutex is targeted with litigation, that it "believe[s] that the lawsuits against HaloMD will likely put an end to the aggressive and massively lucrative strategy employed on behalf of clients like Nutex" and "*[w]ithout HaloMD and its special sauce, used to achieve awards 8x greater than QPA, Nutex's financials would be devastated as revenue and profitability shrink back to pre-HaloMD times*." (Emphasis added).

98.     Additionally, the Blue Orca Report stated that Nutex faces a further risk "hanging over its business model"—namely, that a majority of its recognized revenue may be uncollectable.

Specifically, Blue Orca cited a recent decision by the U.S. Court of Appeals for the Fifth Circuit in which the court ruled that providers could not sue to enforce NSA arbitration awards because the awards are not enforceable under the Federal Arbitration Act. The Blue Orca Report also noted that "Nutex's revenue and profitability critically depend on the collectability of the arbitration awards" but, in light of the Fifth Circuit's ruling, "many healthcare insurers may simply refuse to pay NSA arbitration awards." Therefore, because Nutex has a "massive receivables balance of uncollected awards," Blue Orca suggested that the Company may be particularly at risk. The Blue Orca Report noted that "even Nutex's former auditor Marcum LLP noted a critical audit matter around revenue recognition in Nutex's hospital division, which in turn depends upon the collectability of arbitration awards."

99.     The Blue Orca Report concluded by stating that "[i]f Nutex ceases being able to rely on HaloMD to achieve remarkable results using the NSA arbitration process, our suspicion is that Nutex may rapidly return to penny stock status, where it languished before it hired HaloMD. Either way, we do not see how Nutex is investable."

100.     Following the publication of the Blue Orca Report, the Company's stock price fell $11.18 per share, or approximately 10.1%, to close at $100.01 per share on July 22, 2025.

101.     Thereafter, the Company wrongly assured investors that the allegations in the Blue Orca Report were false. Indeed, on July 24, 2025, the Company issued a press release titled "Nutex Health Responds to Short Seller Report" (the "July 24 Press Release") wherein Nutex stated that it "strongly disagrees with the allegations in the report and believes it is without merit" and that "the Company believes the report contains misrepresentations and conveys a misunderstanding of Nutex Health's business." The July 24 Press Release also stated that the Company "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of

2025 due on or before August 14, 2025."

102.     Then, the truth was fully revealed on August 14, 2025, when the Company issued a press release announcing that it would "delay filing its Form 10-Q for the period ended June 30, 2025" due to "non-cash accounting adjustments related to the treatment of stock-based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings" (the "August 14 Press Release"). Specifically, the August 14 Press Release failed to rebut the allegations contained in the Blue Orca Report. Rather, the Company stated, in relevant part:

> Nutex Health Inc. ("Nutex Health" or the "Company") (NASDAQ: NUTX), a physician-led, integrated healthcare delivery system comprised of 24 state-of-the-art micro hospitals and hospital outpatient departments in 11 states and primary care-centric, risk-bearing physician networks, today announced that it will delay filing its Form 10-Q for the period ending June 30, 2025 due to non-cash accounting adjustments related to the treatment of stock based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings. The Company additionally provided preliminary financial results for the three and six months ended June 30, 2025 and announced a stock repurchase program of up to $25.0 million. . . .

> The Company provided select preliminary unaudited financial results for the three and six months ended June 30, 2025. The preliminary financial information presented below reflects management's current views with respect to the Company's financial results. These preliminary results remain subject to the completion of normal quarter-end and fiscal-end accounting procedures and closing adjustments. Nutex Health will release its full financial results as promptly as reasonably practicable.

> ***The Company hereby announces the cancellation of the conference call that was originally scheduled Friday, August 15, 2025, at 10:30 a.m. ET***. The Company will reschedule the conference call as soon as possible where it will discuss 2nd Quarter financials as well as other topics relevant to the Company.

(Emphasis added).

103.     On this news, the Company's stock price fell $18.22 per share, or approximately 16.4%, to close at $92.91 per share on August 15, 2025.

*Post-Relevant Period Developments*

104.    Following the Relevant Period, on August 21, 2025, the Company filed a Form 8-K with the SEC which included, *inter alia*, a "Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard." Specifically, the Form 8-K revealed that the Audit Committee concluded that certain of the Company's previously issued financial statements[5] "treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and should be restated."

105.    Additionally, the Form 8-K touched on the allegations set forth by Blue Orca but failed to substantively refute the claims made. Instead, the Company conveyed a broad overview of the NSA's arbitration process and its own claims process, acknowledged the Company's relationship with HaloMD, and noted several of the lawsuits filed against HaloMD while highlighting the Company's absence from the actions. Specifically, the Form 8-K stated, in relevant part:

**Arbitration process.**

*Federal Rules Applicable to Out-of-Network Billing*

Congress enacted the No Surprises Act ("NSA") effective January 1, 2022, to protect patients from surprise medical bills incurred when they receive emergency medical services from out-of-network healthcare providers. The NSA achieves this by relieving patients from financial liability for surprise bills and creating an Independent Dispute Resolution ("IDR") process for billing disputes between providers and insurers. The patient is not involved in this process, and payment is issued directly to the provider. The IDR process safeguards providers by promoting fair reimbursement from payors, helping ensure their continued ability to deliver care.

*Independent Dispute Resolution.*

Under the IDR provisions, Nutex Health and the insurer first must try to agree on a price for the services. If negotiations fail, either party has four days to initiate IDR

---

[5] The previously issued financial statements in question were the 1Q25 10-Q and the 2024 10-K.

proceedings. If the parties pursue IDR, either the parties or the Department of Health and Human Services ("HHS") selects a certified independent dispute resolution entity ("CIDRE") to determine the final payment amount. . . .

*Third Party Expert.*

On July 1, 2024, we engaged HaloMD, a third-party expert, to work with us in challenging underpaid out-of-network claims. HaloMD specializes in independent dispute resolution through the NSA and state regulations for out-of-network healthcare providers. Nutex Health determines which claims to submit to arbitration.

Given the complexity of the federal arbitration process and its interaction with state surprise billing laws, it is crucial for providers like Nutex Health to seek tech-enabled expert assistance in the highly complex submission process. This third-party expertise, such as that provided by HaloMD, is essential for navigating the complexity of submission of claims in bifurcated states where either state or federal law may apply, depending on the insurance coverage and services provided. . . .

**Blue Cross/Anthem Litigation in Georgia and Ohio against HaloMD**

Nutex Health has not been named in any lawsuit filed by Blue Cross/Anthem against HaloMD and Nutex Health has no hospital locations in jurisdictions where HaloMD is subject to litigation initiated by insurers.

On May 27, 2025 Blue Cross BlueShield Healthcare Plan of Georgia, Inc. ("BCBSGA") filed a complaint against HaloMD, and Hospitalist Medicine Physicians of Georgia – TCG, PC, Hospitalist Medicine Physicians of Georgia – TCS, PC, and Sound Physicians Emergency Medicine of Georgia, P.C. in the United States District Court of the Northern District of Georgia, Docket No. 1:25-cv-02919, alleging violations of the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, the Georgia RICO statute, the Georgia Deceptive Trade Practices Act, and the Employee Retirement Income Security Act ("ERISA") by purportedly submitting false attestations of eligibility, initiating massive volumes of IDR disputes simultaneously against BCBSGA, with, in the view of BCBSGA, inflated payment offers.


On June 10, 2025, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem") filed a complaint against HaloMD and Alla LaRoque, and Evokes, LLC, Midwest Neurology, LLC, One Care Monitoring, LLC, and Value Monitoring, LLC in the United States District Court, Southern District Of Ohio, Western Division, Case: 1:25-cv-00388-MWM, alleging violations of RICO, the Ohio Corrupt Activity Act, the Ohio Deceptive Trade Practices Act, and ERISA, by purportedly submitting false and fraudulent attestations of eligibility for services, initiating massive volumes of IDR disputes simultaneously against

Anthem, and, in Anthem's view, improperly inflating payment offers.

**Blue Cross/Anthem Litigation in Georgia and Ohio against HaloMD**

Nutex Health has not been named in any lawsuit filed by Blue Cross/Anthem against HaloMD and Nutex Health has no hospital locations in jurisdictions where HaloMD is subject to litigation initiated by insurers.

On May 27, 2025 Blue Cross BlueShield Healthcare Plan of Georgia, Inc. ("BCBSGA") filed a complaint against HaloMD, and Hospitalist Medicine Physicians of Georgia – TCG, PC, Hospitalist Medicine Physicians of Georgia – TCS, PC, and Sound Physicians Emergency Medicine of Georgia, P.C. in the United States District Court of the Northern District of Georgia, Docket No. 1:25-cv-02919, alleging violations of the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, the Georgia RICO statute, the Georgia Deceptive Trade Practices Act, and the Employee Retirement Income Security Act ("ERISA") by purportedly submitting false attestations of eligibility, initiating massive volumes of IDR disputes simultaneously against BCBSGA, with, in the view of BCBSGA, inflated payment offers.

On June 10, 2025, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem") filed a complaint against HaloMD and Alla LaRoque, and Evokes, LLC, Midwest Neurology, LLC, One Care Monitoring, LLC, and Value Monitoring, LLC in the United States District Court, Southern District Of Ohio, Western Division, Case: 1:25-cv-00388-MWM, alleging violations of RICO, the Ohio Corrupt Activity Act, the Ohio Deceptive Trade Practices Act, and ERISA, by purportedly submitting false and fraudulent attestations of eligibility for services, initiating massive volumes of IDR disputes simultaneously against Anthem, and, in Anthem's view, improperly inflating payment offers.

In a press release issued on June 4, 2025 with respect to the lawsuit filed by BCBSGA, HaloMD states that it is prepared to vigorously defend itself in this litigation in a manner that will highlight the lawsuit's meritless nature.

**Short Seller Attack. . . .**

On July 22, 2025, a short seller report that contained various allegations against the Company was published, that had an adverse impact on the market price of our common stock. This report disclosed the writer had a short position with respect to our common stock. On July 23, 2025, the closing price of our common stock was $92.90, representing a decrease of $18.29 or 16.5% compared to the closing price of our common stock on July 21, 2025, prior to the publication of the report. We timely responded to what we strongly consider to be false allegations and misleading statements in the report.

*Harm to the Company*

106. As a direct and proximate result of the Individual Defendants' misconduct, Nutex has lost and expended, and will lose and expend, millions of dollars.

107. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Vo, Bates, and Hosseinion, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

108. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

109. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

110. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

111. Plaintiff will adequately and fairly represent the interests of Nutex and its shareholders in enforcing and prosecuting its rights.

112. Nutex is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

113. Plaintiff is a current shareholder of Nutex and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

114. A pre-suit demand on the Board of Nutex is futile and, therefore, excused. At the time this action was commenced, the seven-person Board consisted of Individual Defendants Vo,

Hosseinion, Spears, Saunders, Grenas, and Reed (the "Director Defendants") and non-party Frank Jaumot (together with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

115.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

116.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

117.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

118.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to

these claims. Specifically, as Board members of Nutex, the Director Defendants knew, or should have known, the material facts surrounding Nutex's financial condition and internal control mechanisms.

119. Defendant Vo is not disinterested or independent. In addition to serving as a director, Defendant Vo also serves as the Company's CEO and as Chairman of the Board. Moreover, Defendant Vo also owns 32.88% of the shares of the Nutex's Class A common stock. Thus, as conceded in the 2025 Proxy, Defendant Vo is a non-independent director. Furthermore, Defendant Vo is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

120. Defendant Hosseinion is not disinterested or independent. In addition to serving as a director, Defendant Hosseinion also serves as President of the Company. Moreover, Defendant Hosseinion served as CEO of Clingience, the Company's predecessor. Thus, as conceded in the 2025 Proxy, Defendant Hosseinion is a non-independent director. Furthermore, Defendant Hosseinion is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

121. Defendant Spears is not disinterested or independent. Spears has served as a Physician Partner, Chief Medical Director, and ED Director at Alexandria Emergency Hospital in Alexandria, Louisiana., a hospital affiliate of the Company, since 2017. Thus, as conceded in the 2025 Proxy, Defendant Spears is a non-independent director.

122. Moreover, Director Defendants Vo, Hosseinion, Spears, Grenas, Reed, and Saunders each signed the 2024 10-K. Accordingly, these Director Defendants breached their

fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

123.     Moreover, Director Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spears each solicited the 2025 Proxy, which led to the reelection of Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spears to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

124.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

125.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

127.     Defendants Reed and Saunders (the "Audit Defendants") served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and

procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

128. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

129. Accordingly, a pre-suit demand on the Board is futile and excused.

## <u>COUNT I</u>
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

132. Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

133.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

134.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, and that the Board and management were not adhering to the Code of Conduct.

135.    The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board.

136.    The materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spears to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

137.    As a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy, the Company has sustained significant damages.

138.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

141.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

142.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

143.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed

to disclose, *inter alia*, that: (i) the Company's third-party IDR vendor was HaloMD; (ii) HaloMD was engaged in fraudulent conduct to achieve lucrative arbitration results for the Company; (iii) the Company's revenue that was being generated through its engagement of HaloMD was unsustainable; (iv) the Company failed to maintain adequate internal controls over its financial and public reporting; (v) the Company overstated its ability to remediate its internal control issues; (vi) as a result of the internal control deficiencies over financial reporting, the Company improperly calculated certain stock based compensation obligations by treating them as equity rather than liabilities; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

144.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

145.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

146.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

147.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

148.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

### COUNT III
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

151.    Plaintiff on behalf of Nutex has no adequate remedy at law.

### COUNT IV
**Against the Individual Defendants for Unjust Enrichment**

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nutex.

154.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Nutex that was tied to the performance or artificially inflated valuation of Nutex, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

155.    Plaintiff, as a shareholder and a representative of Nutex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

156.    Plaintiff on behalf of Nutex has no adequate remedy at law.

<u>COUNT V</u>
**Against the Individual Defendants for Waste of Corporate Assets**

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

159.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

160.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf Nutex, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.       Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.       Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.       Awarding punitive damages;

D.       Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: September 11, 2025               **RIGRODSKY LAW, P.A.**

By:  */s/ Samir Aougab*
        Samir Aougab
        #3930200
        1007 North Orange Street, Suite 453
        Wilmington, DE 19801
        Telephone: (302) 295-5310
        Facsimile: (302) 654-7530
        Email: sa@rl-legal.com

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530

Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com